## LARSON, COMMISSIONER OF SECURITIES, MINNE-SOTA DEPARTMENT OF COMMERCE, ET AL. *v.* VALENTE ET AL.

No. 80–1666.   Argued December 9, 1981—Decided April 21, 1982

Brennan, J., delivered the opinion of the Court, in which Marshall, Blackmun, Powell, and Stevens, JJ., joined. Stevens, J., filed a concurring opinion, *post*, p. 256. White, J., filed a dissenting opinion, in

which REHNQUIST, J., joined, *post*, p. 258. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and O'CONNOR, JJ., joined, *post*, p. 264.

*Larry Salustro*, Special Assistant Attorney General of Minnesota, argued the cause for appellants. With him on the briefs were *Warren Spannaus*, Attorney General, *pro se*, and *William P. Marshall*, Special Assistant Attorney General.

*Barry A. Fisher* argued the cause for appellees. With him on the brief were *David Grosz* and *Robert C. Moest*.*

JUSTICE BRENNAN delivered the opinion of the Court.

The principal question presented by this appeal is whether a Minnesota statute, imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers, discriminates against such organizations in violation of the Establishment Clause of the First Amendment.[1]

## I

Appellants are John R. Larson, Commissioner of Securities, and Warren Spannaus, Attorney General, of the State of Minnesota. They are, by virtue of their offices, responsible for the implementation and enforcement of the Minnesota charitable solicitations Act, Minn. Stat. §§ 309.50–309.61 (1969 and Supp. 1982). This Act, in effect since 1961, provides for a system of registration and disclosure respecting

---

*Briefs of *amici curiae* urging affirmance were filed by *Charles S. Sims* and *Bruce J. Ennis* for the American Civil Liberties Union et al.; by *Nathan Z. Dershowitz* for the American Jewish Congress; by *Lee Boothby* for the Americans United for Separation of Church and State Fund, Inc.; by *Robert L. Toms* for the Center for Law and Religious Freedom of the Christian Legal Society; by *Robert W. Nixon* for the General Conference of Seventh-Day Adventists et al.; and by the Greater Minneapolis Association of Evangelicals.

[1] The Clause provides that "Congress shall make no law respecting an establishment of religion . . . ." It is applied to the States by the Fourteenth Amendment. *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940).

charitable organizations, and is designed to protect the contributing public and charitable beneficiaries against fraudulent practices in the solicitation of contributions for purportedly charitable purposes. A charitable organization subject to the Act must register with the Minnesota Department of Commerce before it may solicit contributions within the State. § 309.52. With certain specified exceptions, all charitable organizations registering under § 309.52 must file an extensive annual report with the Department, detailing, *inter alia*, their total receipts and income from all sources, their costs of management, fundraising, and public education, and their transfers of property or funds out of the State, along with a description of the recipients and purposes of those transfers. § 309.53. The Department is authorized by the Act to deny or withdraw the registration of any charitable organization if the Department finds that it would be in "the public interest" to do so and if the organization is found to have engaged in fraudulent, deceptive, or dishonest practices. § 309.532, subd. 1 (Supp. 1982). Further, a charitable organization is deemed ineligible to maintain its registration under the Act if it expends or agrees to expend an "unreasonable amount" for management, general, and fundraising costs, with those costs being presumed unreasonable if they exceed thirty per cent of the organization's total income and revenue. § 309.555, subd. 1a (Supp. 1982).

From 1961 until 1978, all "religious organizations" were exempted from the requirements of the Act.[2] But effective March 29, 1978, the Minnesota Legislature amended the Act so as to include a "fifty per cent rule" in the exemption provision covering religious organizations. § 309.515, subd. 1(b). This fifty per cent rule provided that only those religious organizations that received more than half of their total con-

---

[2] Section 309.51, subd. 1(a) (1969), repealed in 1973, provided in pertinent part:

"[S]ections 309.50 to 309.61 shall not apply to any group or association serving a bona fide religious purpose when the solicitation is connected

tributions from members or affiliated organizations would remain exempt from the registration and reporting requirements of the Act. 1978 Minn. Laws, ch. 601, § 5.[3]

Shortly after the enactment of § 309.515, subd. 1(b), the Department notified appellee Holy Spirit Association for the Unification of World Christianity (Unification Church) that it was required to register under the Act because of the newly enacted provision.[4] Appellees Valente, Barber, Haft, and Korman, claiming to be followers of the tenets of the Unifica-

---

with such a religious purpose, nor shall such sections apply when the solicitation for such a purpose is conducted for the benefit of such a group or association . . . ."

Between 1973 and 1978, § 309.515, subd. 1, provided in pertinent part: "[S]ections 309.52 and 309.53 shall not apply to . . . :

. . . . .

"(b) Any group or association serving a bona fide religious purpose when the solicitation is connected with such a religious purpose, nor shall such sections apply when the solicitation for such a purpose is conducted for the benefit of such a group or association by any other person with the consent of such group or association. . . ."

[3] The amended exemption provision read in relevant part:
"309.515 Exemptions
"Subdivision 1. . . . [S]ections 309.52 and 309.53 shall not apply to . . . :

. . . . .

"(b) A religious society or organization which received more than half of the contributions it received in the accounting year last ended (1) from persons who are members of the organization; or (2) from a parent organization or affiliated organization; or (3) from a combination of the sources listed in clauses (1) and (2). A religious society or organization which solicits from its religious affiliates who are qualified under this subdivision and who are represented in a body or convention is exempt from the requirements of sections 309.52 and 309.53. The term 'member' shall not include those persons who are granted a membership upon making a contribution as a result of a solicitation."

[4] This notice "discussed the application of the amendments expanding the scope of the charities law to religious organizations, explained the registration procedure, enclosed the proper forms, and sought [appellees'] compliance with the law." Affidavit of Susan E. Fortney, Legal Assistant, Staff of Attorney General of Minnesota, Nov. 2, 1978. The notice also threat-

tion Church, responded by bringing the present action in the United States District Court for the District of Minnesota. Appellees sought a declaration that the Act, on its face and as applied to them through § 309.515, subd. 1(b)'s fifty per cent rule, constituted an abridgment of their First Amendment rights of expression and free exercise of religion, as well as a denial of their right to equal protection of the laws, guaranteed by the Fourteenth Amendment;[5] appellees also sought

---

ened legal action against the Church if it failed to comply. The notice read in pertinent part as follows:

"During the recent Minnesota legislative session, a bill was passed which changes the registration and reporting requirements for charitable organizations which solicit funds in Minnesota. One significant change was in the religious exemption which previously exempted from registering and reporting any organization serving a bona fide religious purpose.

"Minn. Stat. § 309.515 as found in chapter 601 of the 1978 Session Laws provides that the religious exemption now applies to religious groups or societies which receive more than half of its contributions in the accounting year last ended from persons who are members of the organization or from a parent organization or affiliated organization. In other terms, a religious organization which solicits more than half its funds from non-members must register and report according to the provisions of the Minnesota Charitable Solicitation Law.

"From the nature of your solicitation it appears that Holy Spirit Association for the Unification of World Christianity must complete a Charitable Organization Registration Statement and submit it to the Minnesota Department of Commerce. The Charitable Organization Registration Statement must be accompanied with a financial statement for the fiscal year last ended.

"I am enclosing the proper forms and an information sheet for your use. Please be advised that the proper forms must be on file with the Department of Commerce by September 30, 1978, or we will consider taking legal action to ensure your compliance." Affidavit of Susan E. Fortney, *supra*, Exhibit A.

[5] Appellees' complaint stated in pertinent part that the "application of the statutes to itinerant missionaries whose Churches are not established in Minnesota, but not to Churches with substantial local membership, constitutes an unequal application of the law." App. A–5. The focus of this allegation was plainly the fifty per cent rule of § 309.515, subd. 1(b).

temporary and permanent injunctive relief. Appellee Unification Church was later joined as a plaintiff by stipulation of the parties, and the action was transferred to a United States Magistrate.

After obtaining a preliminary injunction,[6] appellees moved for summary judgment. Appellees' evidentiary support for this motion included a "declaration" of appellee Haft, which described in some detail the origin, "religious principles," and practices of the Unification Church. App. A–7—A–14. The declaration stated that among the activities emphasized by the Church were "door-to-door and public-place proselytizing and solicitation of funds to support the Church," id., at A–8, and that the application of the Act to the Church through § 309.515, subd. 1(b)'s fifty per cent rule would deny its members their "religious freedom," id., at A–14. Appellees also argued that by discriminating among religious organizations, § 309.515, subd. 1(b)'s fifty per cent rule violated the Establishment Clause.

Appellants replied that the Act did not infringe appellees' freedom to exercise their religious beliefs. Appellants sought to distinguish the present case from Murdock v. Pennsylvania, 319 U. S. 105 (1943), where this Court invalidated a municipal ordinance that had required the licensing of Jehovah's Witnesses who solicited donations in exchange for

---

[6] Appellants responded to appellees' motion for a preliminary injunction with a motion to dismiss. App. to Juris. Statement A–38. They disputed appellees' claims on the merits, and also challenged appellees' standing to raise their Establishment Clause claims, arguing that the Unification Church was not a religion within the meaning of that Clause. Id., at A–44—A–45. The Magistrate made findings of fact that the Unification Church was a California nonprofit religious corporation, and that it had been granted tax exempt religious organization status by the United States Internal Revenue Service and the State of Minnesota. Id., at A–37. These findings were later incorporated into the Magistrate's report and recommendation on the motion for summary judgment. Id., at A–21. He declined, however, to rule on the issue of the religious status of the Church. Id., at A–47.

religious literature, by arguing that unlike the activities of the petitioners in *Murdock*, appellees' solicitations bore no substantial relationship to any religious expression, and that they were therefore outside the protection of the First Amendment.[7] Appellants also contended that the Act did not violate the Establishment Clause. Finally, appellants argued that appellees were not entitled to challenge the Act until they had demonstrated that the Unification Church was a religion and that its fundraising activities were a religious practice.

The Magistrate determined, however, that it was not necessary for him to resolve the questions of whether the Unification Church was a religion, and whether appellees' activities were religiously motivated, in order to reach the merits of appellees' claims. Rather, he found that the "overbreadth" doctrine gave appellees standing to challenge the Act's constitutionality. On the merits, the Magistrate held that the Act was facially unconstitutional with respect to religious organizations, and was therefore entirely void as to such organizations, because § 309.515, subd. 1(b)'s fifty per cent rule failed the second of the three Establishment Clause "tests" set forth by this Court in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971).[8] The Magistrate also held on due

---

[7] Appellants asserted that the central issue in the case was "whether [appellees'] fund raising practices constitute expression of religious beliefs within the protection of the First Amendment." Defendants' Objections to Report and Recommendations of Magistrate Robert Renner in No. Civ. 4–78–453 (DC Minn.), p. 2. Appellants argued that appellees' fundraising activities were not a form of religious expression; they provided evidentiary support for this argument in the form of numerous affidavits of persons claiming to be former members of the Unification Church, who asserted that they had been encouraged to engage in fundraising practices that were both fraudulent and unrelated to any religious purpose.

[8] That second test requires that the "principal or primary effect" of the challenged statute "be one that neither advances nor inhibits religion." 403 U. S., at 612. The Magistrate found that § 309.515, subd. 1(b)'s fifty per cent rule violated that requirement "in that it inhibit[ed] religious orga-

process grounds that certain provisions of the Act were unconstitutional as applied to any groups or persons claiming the religious-organization exemption from the Act. The Magistrate therefore recommended, *inter alia*, that appellees be granted the declarative and permanent injunctive relief that they had sought—namely, a declaration that the Act was unconstitutional as applied to religious organizations and their members, and an injunction against enforcement of the Act as to any religious organization. Accepting these recommendations, the District Court entered summary judgment in favor of appellees on these issues.[9]

On appeal, the United States Court of Appeals for the Eighth Circuit affirmed in part and reversed in part. 637 F. 2d 562 (1981). On the issue of standing, the Court of Appeals affirmed the District Court's application of the overbreadth doctrine, citing *Village of Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620, 634 (1980), for

---

nizations which receive[d] more than half of their contributions from non-members, and thereby enhance[d] religious organizations which receive[d] less than half from non-members." App. to Juris. Statement A–24.

[9] The District Court's judgment provided:

"1. The Minnesota Charitable Solicitations Act, Minn. Stat. § 309.50 *et seq.*, is unconstitutional as applied to religious organizations and members thereof;

"2. The Act is constitutional as applied to non-religious organizations and members thereof;

"3. Sections 309.534, subd. 1(a), and 309.581 of the Act is [sic] unconstitutional as applied to persons claiming to be religious organizations or members thereof;

"4. The constitutionality of the application of section 309.532 [relating to denial, suspension, and revocation of licenses issued under the Act] to [appellees] and others whose claims to a religious exemption are challenged by the State is a nonjusticiable issue;

"5. [Appellant Larson] is permanently enjoined from enforcing the Act as to any and all religious organizations;

"6. [Appellant Larson] is permanently enjoined from utilizing sections 309.534, subd. 1(a), and 309.581 to enforce the Act as against [appellees] and other persons claiming to be religious organizations or members thereof." *Id.*, at A–18—A–19.

the proposition that "a litigant whose own activities are un-protected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." 637 F. 2d, at 564–565. On the merits, the Court of Appeals affirmed the District Court's holding that the "inexplicable religious classification" embodied in the fifty per cent rule of § 309.515, subd. 1(b), violated the Establishment Clause.[10] *Id.*, at 565–570. Applying the Minnesota rule of severability, the Court of Appeals also held that § 309.515, subd. 1(b), as a whole should not be stricken from the Act, but rather that the fifty per cent rule should be stricken from § 309.515, subd. 1(b). *Id.*, at 570. But the court disagreed with the District Court's conclusion that appellees and others should enjoy the religious-organization exemption from the Act merely by claiming to be such organizations: The court held that proof of religious-organization status was required in order to gain the exemption, and left the question of appellees' status "open . . . for further development." *Id.*, at 570–571. The Court of Appeals accordingly vacated the judgment of the District Court and remanded the action for entry of a modified injunction and for further appropriate proceedings. *Id.*, at 571.[11] We noted probable jurisdiction. 452 U. S. 904 (1981).

---

[10] The Court of Appeals supported this conclusion on grounds broader than those of the District Court. Whereas the District Court had found § 309.515, subd. 1(b)'s fifty per cent rule to violate only the second of the *Lemon* tests, the Court of Appeals found the rule to violate the first of those tests as well. 637 F. 2d, at 567–568. The first *Lemon* test provides that "the statute must have a secular legislative purpose." 403 U. S., at 612.

[11] The Court of Appeals summarized its holdings as follows:

"[W]e agree with the district court's holding that [appellees] have standing to challenge the classification made in the exemption section of the Act, as it pertains to religious organizations; we agree with the court's invalidation of the classification made in that section; we agree that the exemption section should apply to all religious organizations, subject to possible legislative revision; we disagree with the conclusion that no part of the Act may

## II

Appellants argue that appellees are not entitled to be heard on their Establishment Clause claims. Their rationale for this argument has shifted, however, as this litigation has progressed. Appellants' position in the courts below was that the Unification Church was not a religion, and more importantly that appellees' solicitations were not connected with any religious purpose. From these premises appellants concluded that appellees were not entitled to raise their Establishment Clause claims until they had demonstrated that their activities were within the protection of that Clause. The courts below rejected this conclusion, instead applying the overbreadth doctrine in order to allow appellees to raise their Establishment Clause claims. In this Court, appellants have taken an entirely new tack. They now argue that the Unification Church is not a "religious organization" within the meaning of Minnesota's charitable solicitations Act, and that the Church therefore would not be entitled to an exemption under § 309.515, subd. 1(b), even if the fifty per cent rule were declared unconstitutional. From this new premise appellants conclude that the courts below erred in invalidating § 309.515, subd. 1(b)'s fifty per cent rule without first requiring appellees to demonstrate that they would have been able to maintain their exempt status but for that rule, and thus that its adoption had caused them injury in fact. We have considered both of appellants' rationales, and hold that neither of them has merit.

"The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure

---

be applied to religious organizations, but leave open questions of construction and validity for further development, including the application of the Act to charitable organizations; and we disagree with the conclusion that [appellees] and others claiming the religious exemption should automatically enjoy such exemption, but leave open the question of [appellees'] status for further development." 637 F. 2d, at 571.

that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Duke Power Co.* v. *Carolina Environmental Study Group*, 438 U. S. 59, 72 (1978), quoting *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). This requirement of a "personal stake" must consist of "a 'distinct and palpable injury . . .' to the plaintiff," *Duke Power Co., supra*, at 72, quoting *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975), and "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," *Duke Power Co., supra*, at 72, quoting *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 261 (1977). Application of these constitutional standards to the record before us and the factual findings of the District Court convince us that the Art. III requirements for standing are plainly met by appellees.

Appellants argue in this Court that the Unification Church is not a "religious organization" within the meaning of the Act, and therefore that appellees cannot demonstrate injury in fact. We note at the outset, however, that in the years before 1978 the Act contained a general exemption provision for all religious organizations, and that during those years the Unification Church was not required by the State to register and report under the Act. It was only in 1978, shortly after the addition of the fifty per cent rule to the religious-organization exemption, that the State first attempted to impose the requirements of the Act upon the Unification Church. And when the State made this attempt, it deliberately chose to do so in express and exclusive reliance upon the newly enacted fifty per cent rule of § 309.515, subd. 1(b). See n. 4, *supra*.[12] The present suit was initiated by appellees in direct response to that attempt by the State to force the Church's registration. It is thus plain that appellants'

---

[12] JUSTICE REHNQUIST's dissent suggests, *post*, at 265–266, and n. 2, that our interpretation of the State's grounds for application of the Act to appellees is erroneous. But the letter quoted in n. 4, *supra*, speaks for itself,

stated rationale for the application of the Act to appellees was that § 309.515, subd. 1(b), *did* apply to the Unification Church.[13]  But § 309.515, subd. 1(b), by its terms applies only to religious organizations.  It follows, therefore, that an essential premise of the State's attempt to require the Unification Church to register under the Act by virtue of the fifty per cent rule in § 309.515, subd. 1(b), is that the Church *is* a religious organization.  It is logically untenable for the State to take the position that the Church is not such an organization, because that position destroys an essential premise of the exercise of statutory authority at issue in this suit.

In the courts below, the State joined issue precisely on the premise that the fifty per cent rule of § 309.515, subd. 1(b), was sufficient authority in itself to compel appellees' registration.  The adoption of that premise precludes the position

---

and we reject the novel suggestion that the contents of such a notification of official enforcement action may be ignored by this Court depending upon the state official who signs the notice.

[13] The Department's attempt to apply the Act to appellees by means of § 309.515, subd. 1(b), was consistent with the expectation, evident in the legislative history of § 309.515, subd. 1(b), that that provision's fifty per cent rule would be applied to the Unification Church in order to deny it continued exemption from the requirements of the Act.  See *infra*, at 253–255.

JUSTICE REHNQUIST's dissent suggests, *post*, at 264, that "the Act applies to appellees not by virtue of the 'fifty percent rule,' but by virtue of § 309.52."  This suggestion misses the point.  Section 309.52 announces the Act's general registration requirement for charitable organizations.  In 1978, the State sought to compel the Church to register and report under the Act, relying upon § 309.515, subd. 1(b).  The State might have chosen to rely upon some other provision, *e. g.*, § 309.515, subd. 1(a)(1), which exempts charitable organizations receiving less than $10,000 annually from the public.  Instead the State chose to rely upon § 309.515, subd. 1(b).  Thus if the Act applies to appellees, it of course does so by the combined effect of § 309.52 and § 309.515, subd. 1(b).  In this attenuated sense the Act does apply to appellees "by virtue of § 309.52."  But nevertheless the State sought to impose the requirements of the Act upon appellees by only one means out of the several available to it, and that means was § 309.515, subd. 1(b).

that the Church is not a religious organization. And it remains entirely clear that if we were to uphold the constitutionality of the fifty per cent rule, the State would, without more, insist upon the Church's registration. In this Court, the State has changed its position, and purports to find independent bases for denying the Church an exemption from the Act. Considering the development of this case in the courts below, and recognizing the premise inherent in the State's attempt to apply the fifty per cent rule to appellees, we do not think that the State's change of position renders the controversy between these parties any less concrete. The fact that appellants chose to apply § 309.515, subd. 1(b), and its fifty per cent rule as the sole statutory authority requiring the Church to register under the Act compels the conclusion that, at least for purposes of this suit challenging that State application, the Church is indeed a religious organization within the meaning of the Act.

With respect to the question of injury in fact, we again take as the starting point of our analysis the fact that the State attempted to use § 309.515, subd. 1(b)'s fifty per cent rule in order to compel the Unification Church to register and report under the Act. That attempted use of the fifty per cent rule as the State's instrument of compulsion necessarily gives appellees standing to challenge the constitutional validity of the rule. The threatened application of § 309.515, subd. 1(b), and its fifty per cent rule to the Church surely amounts to a distinct and palpable injury to appellees: It disables them from soliciting contributions in the State of Minnesota unless the Church complies with registration and reporting requirements that are hardly *de minimis*.[14] Just as surely, there is a fairly traceable causal connection between the claimed injury and the challenged conduct—here, between the claimed disabling and the threatened application of § 309.515, subd. 1(b), and its fifty per cent rule.

---

[14] See *supra,* at 230–231; n. 29, *infra.*

Of course, the Church cannot be assured of a continued religious-organization exemption even in the absence of the fifty per cent rule. See n. 30, *infra*. Appellees have not yet shown an entitlement to the entirety of the broad injunctive relief that they sought in the District Court—namely, a permanent injunction barring the State from subjecting the Church to the registration and reporting requirements of the Act. But that fact by no means detracts from the palpability of the particular and discrete injury caused to appellees by the State's threatened application of § 309.515, subd. 1(b)'s fifty per cent rule. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 261–262. The Church may indeed be compelled, ultimately, to register under the Act on some ground other than the fifty per cent rule, and while this fact does affect the nature of the relief that can properly be granted to appellees on the present record, it does not deprive this Court of jurisdiction to hear the present case. Cf. *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977). In sum, contrary to appellants' suggestion, appellees have clearly demonstrated injury in fact.

JUSTICE REHNQUIST's dissent attacks appellees' Art. III standing by arguing that appellees "have failed to show that a favorable decision of this Court will redress the injuries of which they complain." *Post*, at 270. This argument follows naturally from the dissent's premise that the only meaningful relief that can be given to appellees is a total exemption from the requirements of the Act. See *post*, at 264, 265, 270. But the argument, like the premise, is incorrect. This litigation began after the State attempted to compel the Church to register and report under the Act solely on the authority of § 309.515, subd. 1(b)'s fifty per cent rule. If that rule is declared unconstitutional, as appellees have requested, then the Church cannot be required to register and report under the Act by virtue of that rule. Since that rule was the sole basis for the State's attempt to compel registration that gave

rise to the present suit, a discrete injury of which appellees now complain will indeed be completely redressed by a favorable decision of this Court.

Furthermore, if the fifty per cent rule of § 309.515, subd. 1(b), is declared unconstitutional, then the Church cannot be compelled to register and report under the Act unless the Church is determined not to be a religious organization. And as the Court of Appeals below observed:

"[A] considerable burden is on the state, in questioning a claim of a religious nature. Strict or narrow construction of a statutory exemption for religious organizations is not favored. *Washington Ethical Society* v. *District of Columbia,* 249 F. 2d 127, 129 (D. C. Cir. 1957, Burger, J.)." 637 F. 2d, at 570.

At the very least, then, a declaration that § 309.515, subd. 1(b)'s fifty per cent rule is unconstitutional would put the State to the task of demonstrating that the Unification Church is not a religious organization within the meaning of the Act—and such a task is surely more burdensome than that of demonstrating that the Church's proportion of non-member contributions exceeds fifty per cent. Thus appellees will be given substantial and meaningful relief by a favorable decision of this Court.[15]

---

[15] In reaching the conclusion that appellees' claims would not be redressed by an affirmance of the decision below, JUSTICE REHNQUIST's dissent reveals a draconic interpretation of the redressability requirement that is justified by neither precedent nor principle. The dissent appears to assume that in order to establish redressability, appellees must show that they are *certain,* ultimately, to receive a religious-organization exemption from the registration and reporting requirements of the Act—in other words, that there is no other means by which the State can compel appellees to register and report under the Act. We decline to impose that burden upon litigants. As this Court has recognized, "the relevant inquiry is whether . . . the plaintiff has shown *an* injury to himself that is likely to be redressed by a favorable decision." *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 38 (1976) (emphasis added); accord, *Arlington Heights*

Since we conclude that appellees have established Art. III standing, we turn to the merits of the case.[16]

## III

### A

The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. Before the Revolution, religious establishments of differing denominations were common throughout the Colonies.[17] But the Revolutionary generation emphatically disclaimed that European legacy, and "applied the logic of secular liberty to the condition of religion and the churches."[18] If Parliament had lacked the authority to tax unrepresented colonists, then by the same token the newly independent States should be powerless to tax their citizens for the support of a denomination to which they did not belong.[19] The

---

v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 262 (1977). In other words, a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury. Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265, 280–281, n. 14 (1978) (opinion of POWELL, J.)

[16] Appellants contended below that appellees were not entitled to raise their Establishment Clause claims until they had demonstrated that their activities were within the protection of that Clause. The courts below applied the overbreadth doctrine to reject this contention, and appellants argue that those courts erred in doing so. We have no need to address these matters. Appellees have made a sufficiently strong demonstration that the Church is a religion to overcome any prudential standing obstacles to consideration of their Establishment Clause claim.

[17] See S. Cobb, The Rise of Religious Liberty in America: A History 67–453 (1970); L. Pfeffer, Church, State, and Freedom 71–90 (rev. ed. 1967).

[18] B. Bailyn, The Ideological Origins of the American Revolution 265 (1967).

[19] For example, according to John Adams, colonial Massachusetts possessed "the most mild and equitable establishment of religion that was known in the world, if indeed [it] could be called an establishment." Quoted *id.*, at 248. But Baptists in Massachusetts chafed under any form of establishment, and Revolutionary pamphleteer John Allen expressed

force of this reasoning led to the abolition of most denomina-
tional establishments at the state level by the 1780's,[20] and led
ultimately to the inclusion of the Establishment Clause in the
First Amendment in 1791.[21]

This constitutional prohibition of denominational prefer-
ences is inextricably connected with the continuing vitality of
the Free Exercise Clause. Madison once noted: "Security
for civil rights must be the same as that for religious rights.
It consists in the one case in the multiplicity of interests
and in the other in the multiplicity of sects."[22] Madison's vi-
sion—freedom for all religion being guaranteed by free com-
petition between religions—naturally assumed that every
denomination would be equally at liberty to exercise and
propagate its beliefs. But such equality would be impos-
sible in an atmosphere of official denominational preference.
Free exercise thus can be guaranteed only when legislators—
and voters—are required to accord to their own religions the
very same treatment given to small, new, or unpopular de-
nominations. As Justice Jackson noted in another context,
"there is no more effective practical guaranty against arbi-
trary and unreasonable government than to require that the
principles of law which officials would impose upon a minority

---

their views to the members of the General Court of Massachusetts in his
declamation, The American Alarm, or the Bostonian Plea, for the Rights
and Liberties of the People:

"You tell your [colonial] governor that the Parliament of England have no
right to tax the Americans . . . because they are not the representatives of
America; and will you dare to tax the Baptists for a religion they deny?
Are you gentlemen their representatives before GOD, to answer for their
souls and consciences any more than the representatives of England are
the representatives of America? . . . [I]f it be just in the General Court to
take away my sacred and spiritual rights and liberties of conscience and my
property with it, then it is surely right and just in the British Parliament to
take away by power and force my civil rights and property without my con-
sent; this reasoning, gentlemen, I think is plain." Quoted *id.*, at 267–268.

[20] See Pfeffer, *supra*, at 104–119.

[21] *Id.*, at 125–127.

[22] The Federalist No. 51, p. 326 (H. Lodge ed. 1908).

must be imposed generally." *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106, 112 (1949) (concurring opinion).

Since *Everson* v. *Board of Education*, 330 U. S. 1 (1947), this Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can "pass laws which aid one religion" or that "prefer one religion over another." *Id.*, at 15. This principle of denominational neutrality has been restated on many occasions. In *Zorach* v. *Clauson*, 343 U. S. 306 (1952), we said that "[t]he government must be neutral when it comes to competition between sects." *Id.*, at 314. In *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), we stated unambiguously: "The First Amendment mandates governmental neutrality between religion and religion . . . . The State may not adopt programs or practices . . . which 'aid or oppose' any religion. . . . This prohibition is absolute." *Id.*, at 104, 106, citing *Abington School District* v. *Schempp*, 374 U. S. 203, 225 (1963). And Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that "[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief." *Abington School District, supra*, at 305. In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality.

## B

The fifty per cent rule of § 309.515, subd. 1(b), clearly grants denominational preferences of the sort consistently and firmly deprecated in our precedents.[23] Consequently,

[23] Appellants urge that § 309.515, subd. 1(b), does not grant such preferences, but is merely "a law based upon secular criteria which may not identically affect all religious organizations." Brief for Appellants 20. They accordingly cite *McGowan* v. *Maryland*, 366 U. S. 420 (1961), and cases following *Everson* v. *Board of Education*, 330 U. S. 1 (1947), for the propo-

that rule must be invalidated unless it is justified by a compelling governmental interest, cf. *Widmar* v. *Vincent*, 454 U. S. 263, 269–270 (1981), and unless it is closely fitted to further that interest, *Murdock* v. *Pennsylvania*, 319 U. S. 105, 116–117 (1943). With that standard of review in mind, we turn to an examination of the governmental interest asserted by appellants.

---

sition that a statute's "disparate impact among religious organizations is constitutionally permissible when such distinctions result from application of secular criteria." Brief for Appellants 26. We reject the argument. Section 309.515, subd. 1(b), is not simply a facially neutral statute, the provisions of which happen to have a "disparate impact" upon different religious organizations. On the contrary, § 309.515, subd. 1(b), makes explicit and deliberate distinctions between different religious organizations. We agree with the Court of Appeals' observation that the provision effectively distinguishes between "well-established churches" that have "achieved strong but not total financial support from their members," on the one hand, and "churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members," on the other hand. 637 F. 2d, at 566. This fundamental difference between § 309.515, subd. 1(b), and the statutes involved in the "disparate impact" cases cited by appellants renders those cases wholly inapplicable here.

Appellants also argue that reversal of the Court of Appeals is required by *Gillette* v. *United States*, 401 U. S. 437 (1971). In that case we rejected an Establishment Clause attack upon § 6(j) of the Military Selective Service Act of 1967, 50 U. S. C. App. § 456(j) (1964 ed., Supp. V), which afforded "conscientious objector" status to any person who, "by reason of religious training and belief," was "conscientiously opposed to participation in war in any form." 401 U. S., at 441. *Gillette* is readily distinguishable from the present case. Section 6(j) "focused on individual conscientious belief, not on sectarian affiliation." *Id.*, at 454. Under § 6(j), conscientious objector status was available on an equal basis to both the Quaker and the Roman Catholic, despite the distinction drawn by the latter's church between "just" and "unjust" wars, see St. Thomas Aquinas, Summa Theologica, Second Part, Part II, Question 40, Arts. 1, 4; St. Augustine, City of God, Book XIX, Ch. 7. As we noted in *Gillette*, the "critical weakness of petitioners' establishment claim" arose "from the fact that § 6(j), on its face, simply [did] not discriminate on the basis of religious affiliation." 401 U. S., at 450. In contrast, the statute challenged in the case before us focuses precisely and solely upon religious organizations.

Appellants assert, and we acknowledge, that the State of Minnesota has a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and that this interest retains importance when the solicitation is conducted by a religious organization. We thus agree with the Court of Appeals, 637 F. 2d, at 567, that the Act, "viewed as a whole, has a valid secular purpose," and we will therefore assume, *arguendo,* that the Act generally is addressed to a sufficiently "compelling" governmental interest. But our inquiry must focus more narrowly, upon the distinctions drawn by § 309.515, subd. 1(b), itself: Appellants must demonstrate that the challenged fifty per cent rule is closely fitted to further the interest that it assertedly serves.

Appellants argue that § 309.515, subd. 1(b)'s distinction between contributions solicited from members and from nonmembers is eminently sensible. They urge that members are reasonably assumed to have significant control over the solicitation of contributions from themselves to their organization, and over the expenditure of the funds that they contribute, as well. Further, appellants note that as a matter of Minnesota law, members of organizations have greater access than nonmembers to the financial records of the organization. Appellants conclude:

"Where the safeguards of membership funding do not exist, the need for public disclosure is obvious. . . .

". . . As public contributions increase as a percentage of total contributions, the need for public disclosure increases. . . . The particular point at which public disclosure should be required . . . is a determination for the legislature. In this case, the Act's 'majority' distinction is a compelling point, since it is at this point that the organization becomes predominantly public-funded." Brief for Appellants 29.

We reject the argument, for it wholly fails to justify the only aspect of § 309.515, subd. 1(b), under attack—the selective fifty per cent rule. Appellants' argument is based on three distinct premises: that members of a religious organiza-

tion can and will exercise supervision and control over the organization's solicitation activities when membership contributions exceed fifty per cent; that membership control, assuming its existence, is an adequate safeguard against abusive solicitations of the public by the organization; and that the need for public disclosure rises in proportion with the *percentage* of nonmember contributions. Acceptance of all three of these premises is necessary to appellants' conclusion, but we find no substantial support for any of them in the record.

Regarding the first premise, there is simply nothing suggested that would justify the assumption that a religious organization will be supervised and controlled by its members simply because they contribute more than half of the organization's solicited income. Even were we able to accept appellants' doubtful assumption that members will *supervise* their religious organization under such circumstances,[24] the record before us is wholly barren of support for appellants' further assumption that members will effectively *control* the organization if they contribute more than half of its solicited income. Appellants have offered no evidence whatever that members of religious organizations exempted

---

[24] In support of their assumption of such supervision, appellants cite Minn. Stat. § 317.28(2) (1969), which allows any member of a domestic nonprofit corporation to "inspect all books and records for any proper purpose at any reasonable time." But this provision applies only to domestic nonprofit corporations; appellants have made no showing that religious organizations incorporated in other States operate under an analogous constraint. Further, in Minnesota even domestic religious organizations need not be organized as nonprofit corporations—they may also choose to organize under Minn. Stat., ch. 315, governing "Religious Associations," which has no provision analogous to § 317.28(2). Moreover, even as to the religious organizations to which it applies, § 317.28(2) obviously does not ensure that any member of a religious organization will actually take advantage of the supervision permitted by that provision. And finally, since § 317.28(2) applies irrespective of the percentage of membership contributions, it cannot provide any justification at all for the fifty per cent rule in § 309.515, subd. 1(b). In sum, appellants' assumption of membership supervision is purely conjectural.

by § 309.515, subd. 1(b)'s fifty per cent rule in fact control their organizations. Indeed, the legislative history of § 309.515, subd. 1(b), indicates precisely to the contrary.[25] In short, the first premise of appellants' argument has no merit.

Nor do appellants offer any stronger justification for their second premise—that membership control is an adequate safeguard against abusive solicitations of the public by the organization. This premise runs directly contrary to the central thesis of the entire Minnesota charitable solicitations Act—namely, that charitable organizations soliciting contributions from the public cannot be relied upon to regulate themselves, and that state regulation is accordingly necessary.[26] Appellants offer nothing to suggest why religious organizations should be treated any differently in this respect. And even if we were to assume that the members of religious organizations have some incentive, absent in nonreligious organizations, to protect the interests of nonmembers solicited by the organization, appellants' premise would still

---

[25] An early draft of that provision allowed an exemption from the Act only for a religious organization that solicited "substantially more than half of the contributions it received . . . from persons *who have a right to vote as a member* of the organization." Minn. H. 1246, 1977–1978 Sess., § 4 (read Apr. 6, 1977). The italicized language was later amended to read, "who are members." Attachment to Minutes of Meeting of Commerce and Economic Development Committee, Jan. 24, 1978. Since § 309.515, subd. 1(b), as enacted deliberately omits membership voting rights as a requirement for a religious organization's exemption, it clearly permits religious organizations that are not subject to control by their membership to be exempted from the Act. Of course, even if § 309.515, subd. 1(b), exempted only those religious organizations with membership voting rights, the provision obviously would not ensure that the membership actually exercised its voting rights so as to control the organization in any effective manner.

[26] This thesis is evident in the Act's treatment of nonreligious organizations that might solicit within the State: With exceptions not relevant here, such organizations are exempted from the registration and reporting requirements of the Act only if their solicitations of the public are *de minimis*, § 309.515, subds. 1(a)(1), (f), or if they are subject to independent state regulation, § 309.515, subd. 1(c).

fail to justify the fifty per cent rule: Appellants offer no reason why the members of religious organizations exempted under § 309.515, subd. 1(b)'s fifty per cent rule should have any *greater* incentive to protect nonmembers than the members of nonexempted religious organizations have. Thus we also reject appellants' second premise as without merit.

Finally, we find appellants' third premise—that the need for public disclosure rises in proportion with the *percentage* of nonmember contributions—also without merit. The flaw in appellants' reasoning here may be illustrated by the following example. Church A raises $10 million, 20 per cent from nonmembers. Church B raises $50,000, 60 per cent from nonmembers. Appellants would argue that although the public contributed $2 million to Church A and only $30,000 to Church B, there is less need for public disclosure with respect to Church A than with respect to Church B. We disagree; the need for public disclosure more plausibly rises in proportion with the *absolute amount*, rather than with the *percentage*, of nonmember contributions.[27] The State of Minnesota has itself adopted this view elsewhere in § 309.515: With qualifications not relevant here, charitable organizations that receive annual nonmember contributions of less than $10,000 are exempted from the registration and reporting requirements of the Act. § 309.515, subd. 1(a).

We accordingly conclude that appellants have failed to demonstrate that the fifty per cent rule in § 309.515, subd. 1(b), is "closely fitted" to further a "compelling governmental interest."

## C

In *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), we announced three "tests" that a statute must pass in order to avoid the prohibition of the Establishment Clause.

---

[27] We do not suggest, however, that an exemption provision based upon the absolute amount of nonmember contributions would necessarily satisfy the standard set by the Establishment Clause for laws granting denominational preferences.

"First, the statute must have a secular legislative pur-
pose; second, its principal or primary effect must be one
that neither advances nor inhibits religion, *Board of
Education* v. *Allen*, 392 U. S. 236, 243 (1968); finally,
the statute must not foster 'an excessive governmental
entanglement with religion.' *Walz* [v. *Tax Comm'n*,
397 U. S. 664, 674 (1970)]." *Id.*, at 612–613.

As our citations of *Board of Education* v. *Allen*, 392 U. S.
236 (1968), and *Walz* v. *Tax Comm'n*, 397 U. S. 664 (1970),
indicated, the *Lemon* v. *Kurtzman* "tests" are intended to
apply to laws affording a uniform benefit to *all* religions,[28]
and not to provisions, like § 309.515, subd. 1(b)'s fifty per
cent rule, that discriminate *among* religions.   Although
application of the *Lemon* tests is not necessary to the dispo-
sition of the case before us, those tests do reflect the same
concerns that warranted the application of strict scrutiny to
§ 309.515, subd. 1(b)'s fifty per cent rule.   The Court of Ap-
peals found that rule to be invalid under the first two *Lemon*
tests.   We view the third of those tests as most directly im-
plicated in the present case.   Justice Harlan well described
the problems of entanglement in his separate opinion in
*Walz*, where he observed that governmental involvement in
programs concerning religion

"may be so direct or in such degree as to engender
a risk of politicizing religion. . . . [R]eligious groups
inevitably represent certain points of view and not in-
frequently assert them in the political arena, as evi-
denced by the continuing debate respecting birth control
and abortion laws.   Yet history cautions that politi-
cal fragmentation on sectarian lines must be guarded

---

[28] *Allen* involved a state law requiring local public school authorities to
lend textbooks free of charge to all students in grades seven through
twelve, including those in parochial schools.   392 U. S., at 238.   *Walz* ex-
amined a state law granting property tax exemptions to religious organiza-
tions for religious properties used solely for religious worship.   397 U. S.,
at 666.   And in *Lemon* itself, the challenged state laws provided aid to
church-related elementary and secondary schools.   403 U. S., at 606.

against. . . . [G]overnment participation in certain programs, whose very nature is apt to entangle the state in details of administration and planning, may escalate to the point of inviting undue fragmentation." 397 U. S., at 695.

The Minnesota statute challenged here is illustrative of this danger. By their "very nature," the distinctions drawn by § 309.515, subd. 1(b), and its fifty per cent rule "engender a risk of politicizing religion"—a risk, indeed, that has already been substantially realized.

It is plain that the principal effect of the fifty per cent rule in § 309.515, subd. 1(b), is to impose the registration and reporting requirements of the Act on some religious organizations but not on others. It is also plain that, as the Court of Appeals noted, "[t]he benefit conferred [by exemption] constitutes a substantial advantage; the burden of compliance with the Act is certainly not *de minimis*." 637 F. 2d, at 568.[29] We do not suggest that the burdens of compliance with the Act would be intrinsically impermissible if they were imposed evenhandedly. But this statute does not operate evenhandedly, nor was it designed to do so: The fifty per

---

[29] The registration statement required by § 309.52 calls for the provision of a substantial amount of information, much of which penetrates deeply into the internal affairs of the registering organization. The organization must disclose the "[g]eneral purposes for which contributions . . . will be used," the "[b]oard, group or individual having final discretion as to the distribution and use of contributions received," and "[s]uch other information as the department may . . . require"—and these are only three of sixteen enumerated items of information required by the registration statement. The annual report required by § 309.53 is even more burdensome and intrusive. It must disclose "[t]otal receipts and total income from all sources," the cost of "management," "fund raising," and "public education," and a list of "[f]unds or properties transferred out of state, with explanation as to recipient and purpose," to name only a few. Further, a religious organization that must register under the Act may have its registration withdrawn at any time if the Department or the Attorney General concludes that the religious organization is spending "an unreasonable amount" for management, general, and fund-raising costs. § 309.555.

cent rule of § 309.515, subd. 1(b), effects the *selective* legislative imposition of burdens and advantages upon particular denominations. The "risk of politicizing religion" that inheres in such legislation is obvious, and indeed is confirmed by the provision's legislative history. For the history of § 309.515, subd. 1(b)'s fifty per cent rule demonstrates that the provision was drafted with the explicit intention of including particular religious denominations and excluding others. For example, the second sentence of an early draft of § 309.515, subd. 1(b), read: "A religious society or organization which solicits from its religious affiliates who are qualified under this subdivision and who are represented in a body or convention *that elects and controls the governing board of the religious society or organization* is exempt from the requirements of . . . Sections 309.52 and 309.53." Minn. H. 1246, 1977–1978 Sess., § 4 (read Apr. 6, 1978). The legislative history discloses that the legislators perceived that the italicized language would bring a Roman Catholic Archdiocese within the Act, that the legislators did not want the amendment to have that effect, and that an amendment deleting the italicized clause was passed in committee for the sole purpose of exempting the Archdiocese from the provisions of the Act. Transcript of Legislative Discussions of § 309.515, subd. 1(b), as set forth in Declaration of Charles C. Hunter (on file in this Court) 8–9. On the other hand, there were certain religious organizations that the legislators did not want to exempt from the Act. One State Senator explained that the fifty per cent rule was "an attempt to deal with the religious organizations which are soliciting on the street and soliciting by direct mail, but who are not substantial religious institutions in . . . our state." *Id.*, at 13. Another Senator said, "what you're trying to get at here is the people that are running around airports and running around streets and soliciting people and you're trying to remove them from the exemption that normally applies to religious organizations." *Id.*, at 14. Still another Senator, who ap-

parently had mixed feelings about the proposed provision, stated, "I'm not sure why we're so hot to regulate the Moonies anyway." *Id.*, at 16.

In short, the fifty per cent rule's capacity—indeed, its express design—to burden or favor selected religious denominations led the Minnesota Legislature to discuss the characteristics of various sects with a view towards "religious gerrymandering," *Gillette* v. *United States*, 401 U. S. 437, 452 (1971). As THE CHIEF JUSTICE stated in *Lemon*, 403 U. S., at 620: "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction . . . of churches."

## IV

In sum, we conclude that the fifty per cent rule of § 309.515, subd. 1(b), is not closely fitted to the furtherance of any compelling governmental interest asserted by appellants, and that the provision therefore violates the Establishment Clause. Indeed, we think that § 309.515, subd. 1(b)'s fifty per cent rule sets up precisely the sort of official denominational preference that the Framers of the First Amendment forbade. Accordingly, we hold that appellees cannot be compelled to register and report under the Act on the strength of that provision.[30]

The judgment of the Court of Appeals is

*Affirmed.*

---

[30] In so holding, we by no means suggest that the State of Minnesota must in all events allow appellees to remain exempt from the provisions of the charitable solicitations Act. We agree with the Court of Appeals that appellees and others claiming the benefits of the religious-organization exemption should not automatically enjoy those benefits. 637 F. 2d, at 571. Rather, in order to receive them, appellees may be required by the State to prove that the Unification Church is a religious organization within the meaning of the Act. Nothing in our opinion suggests that appellants could not attempt to compel the Unification Church to register under the Act as

JUSTICE STEVENS, concurring.

As the Court points out, *ante*, at 243, invalidation of the 50-percent rule would require the State to shoulder the considerable burden of demonstrating that the Unification Church is not a religious organization if the State persists in its attempt to require the Church to register and file financial statements. The burden is considerable because the record already establishes a prima facie case that the Church is a religious organization,[1] and because a strict construction of a statutory exemption for religious organizations is disfavored and may give rise to constitutional questions.[2] JUSTICE REHNQUIST therefore is plainly wrong when he asserts in dissent that "invalidation of the fifty percent rule will have absolutely no effect on the Association's obligation to register and report as a *charitable organization* under the Act." *Post*, at 267, n. 3 (emphasis in original). The 50-percent rule has caused appellees a significant injury in fact because it has

a charitable organization not entitled to the religious-organization exemption, and put the Church to the proof of its bona fides as a religious organization. Further, nothing in our opinion disables the State from denying exemption from the Act, or from refusing registration and licensing under the Act, to persons or organizations proved to have engaged in frauds upon the public. See § 309.515, subd. 3. We simply hold that because the fifty per cent rule of § 309.515, subd. 1(b), violates the Establishment Clause, appellees cannot be compelled to register and report under the Act on the strength of that provision.

[1] The Church has been incorporated in California as a religious corporation and has been treated as a religious organization for tax purposes by the Federal Government and by the State of Minnesota. App. to Juris. Statement A–37. The Church was treated as a religious organization by the State prior to the enactment of the 50-percent rule in 1978. According to the Magistrate, the appellees "have submitted substantial, although not uncontroverted, evidence of the religious nature of the Unification Church and of their solicitations." *Id.*, at A–23; see *id.*, at A–47.

[2] See *Washington Ethical Society* v. *District of Columbia*, 101 U. S. App. D.C. 371, 373, 249 F. 2d 127, 129 (1957) (Burger, J.) ("To construe exemptions so strictly that unorthodox or minority forms of worship would be denied the exemption benefits granted to those conforming to the majority beliefs might well raise constitutional issues").

substituted a simple method of imposing registration and reporting requirements for a more burdensome and less certain method of accomplishing that result. I therefore agree with the Court's conclusion that the appellees have standing to challenge the 50-percent rule in this case.

The more difficult question for me is whether the Court's policy of avoiding the premature adjudication of constitutional issues[3] counsels postponement of any decision on the validity of the 50-percent rule until after the Unification Church's status as a religious organization within the meaning of the Minnesota statute is finally resolved. My difficulty stems from the fact that the trial and resolution of the statutory issue will certainly generate additional constitutional questions.[4] Therefore, it is clear that at least one decision of constitutional moment is inevitable.[5] Under these circumstances, it seems to me that reaching the merits is consistent with our "policy of strict necessity in disposing of constitutional issues," *Rescue Army* v. *Municipal Court*, 331

---

[3] See generally *Rescue Army* v. *Municipal Court*, 331 U. S. 549, 568–574; *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (Brandeis, J., concurring). I have no reservations about the wisdom or importance of this policy. See, *e. g., California ex rel. Cooper* v. *Mitchell Brothers' Santa Ana Theater*, 454 U. S. 90, 94 (STEVENS, J., dissenting); *Minnick* v. *California Dept. of Corrections*, 452 U. S. 105; *University of California Regents* v. *Bakke*, 438 U. S. 265, 411–412 (opinion of STEVENS, J.).

[4] Even if we were to conclude that the constitutional standards for resolving the statutory issue were perfectly clear, there is nevertheless an important interest in avoiding litigation of issues relating to church doctrine. See *United States* v. *Lee*, 455 U. S. 252, 263, n. 2 (STEVENS, J., concurring in judgment). Cf. *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490.

[5] Even if the District Court should find that the Church is not a religious organization, I believe that it is fair to assume that the Church would challenge that conclusion in this Court. I recognize that it is also possible that ultimately we may be required to confront both constitutional problems, but that possibility is present whether we dismiss the appeal pending resolution of the Church's status or we decide now the validity of the 50-percent rule.

U. S. 549, 568. Moreover, a resolution of the question that has been fully considered by the District Court and by the Court of Appeals and that has been fully briefed and argued in this Court is surely consistent with the orderly administration of justice.

I agree with the Court's resolution of the Establishment Clause issue. Accordingly, I join the Court's opinion.

JUSTICE WHITE, with whom JUSTICE REHNQUIST joins, dissenting.

I concur in the dissent of JUSTICE REHNQUIST with respect to standing. I also dissent on the merits.

I

It will be helpful first to indicate what occurred in the lower courts and what the Court now proposes to do. Based on two reports of a Magistrate, the District Court held unconstitutional the Minnesota limitation denying an exemption to religious organizations receiving less than 50 percent of their funding from their own members. The Magistrate recommended this action on the ground that the limitation could not pass muster under the second criterion set down in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), for identifying an unconstitutional establishment of religion—that the principal or primary effect of the statute is one that neither enhances nor inhibits religion. The 50-percent limitation failed this test because it subjected some churches to far more rigorous requirements than others, the effect being to "severely inhibit plaintiff's religious activities." App. to Juris. Statement A–63. This created a preference offensive to the Establishment Clause. *Id.*, at A–33.[1] The Magistrate relied on the inhibiting effect of the 50-percent rule without ref-

---

[1] The Magistrate also recommended, and the District Court agreed, that all of the registration provisions applicable to religious organizations be enjoined as prior restraints offensive to the First Amendment. App. to Juris. Statement A–33. The Court of Appeals did not agree in this respect.

erence to whether or not it was the principal or primary effect of the limitation.   In any event, the Magistrate recommended, and the District Court agreed, that the exemption from registration be extended to all religious organizations.

The Court of Appeals agreed with the District Court that the 50-percent rule violated the Establishment Clause.   Its ruling, however, was on the ground that the limitation failed to satisfy the first *Lemon* criterion—that the statute have a secular rather than a religious purpose.   The court conceded that the Act as a whole had the valid secular purpose of preventing fraudulent or deceptive practices in the solicitation of funds in the name of charity.   The court also thought freeing certain organizations from regulation served a valid purpose because for those organizations public disclosure of funding would not significantly enhance the availability of information to contributors.   Patriotic and fraternal societies that limit solicitation to voting members and certain charitable organizations that do not solicit in excess of $10,000 annually from the public fell into this category.   But the court found no sound secular legislative purpose for the 50-percent limitation with respect to religious organizations because it "appears to be designed to shield favored sects, while continuing to burden other sects."   637 F. 2d 562, 567.   The challenged provision, the Court of Appeals said, "expressly separates two classes of religious organizations and makes the separation for no valid secular purpose that has been suggested by defendants.   Inexplicable disparate treatment will not generally be attributed to accident; it seems much more likely that at some stage of the legislative process special solicitude for particular religious organizations affected the choice of statutory language.   The resulting discrimination is constitutionally invidious." *Id.*, at 568.   The Court of Appeals went on to say that if it were necessary to apply the second part of the *Lemon* test, the provision would also fail to survive that examination because it advantaged some organizations and disadvantaged others.

In this Court, the case is given still another treatment. The *Lemon* v. *Kurtzman* tests are put aside because they are applicable only to laws affording uniform benefit to all religions, not to provisions that discriminate among religions. Rather, in cases of denominational preference, the Court says that "our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." *Ante*, at 246. The Court then invalidates the challenged limitation.

It does so by first declaring that the 50-percent rule makes explicit and deliberate distinctions between different religious organizations. The State's submission that the 50-percent limitation is a law based on secular criteria which happens not to have an identical effect on all religious organizations is rejected. The Court then holds that the challenged rule is not closely fitted to serve any compelling state interest and rejects each of the reasons submitted by the State to demonstrate that the distinction between contributions solicited from members and from nonmembers is a sensible one. Among others, the Court rejects the proposition that membership control is an adequate safeguard against deceptive solicitations of the public. The ultimate conclusion is that the exemption provision violates the Establishment Clause.

## II

I have several difficulties with this disposition of the case. First, the Court employs a legal standard wholly different from that applied in the courts below. The premise for the Court's standard is that the challenged provision is a deliberate and explicit legislative preference for some religious denominations over others. But there was no such finding in the District Court. That court proceeded under the second *Lemon* test and then relied only on the disparate impact of the provision. There was no finding of a discriminatory or preferential legislative purpose. If this case is to be judged by a standard not employed by the courts below and if the

new standard involves factual issues or even mixed questions of law and fact that have not been addressed by the District Court, the Court should not itself purport to make these factual determinations. It should remand to the District Court.

In this respect, it is no answer to say that the Court of Appeals appeared to find, although rather tentatively, that the state legislature had acted out of intentional denominational preferences. That court was no more entitled to supply the missing factual predicate for a different legal standard than is this Court. It is worth noting that none of the Court of Appeals' judges on the panel in this case is a resident of Minnesota.

Second, apparently realizing its lack of competence to judge the purposes of the Minnesota Legislature other than by the words it used, the Court disposes in a footnote of the State's claim that the 50-percent rule is a neutral, secular criterion that has disparate impact among religious organizations. The limitation, it is said, "is not simply a facially neutral statute" but one that makes "explicit and deliberate distinctions between different religious organizations." *Ante*, at 247, n. 23. The rule itself, however, names no churches or denominations that are entitled to or denied the exemption. It neither qualifies nor disqualifies a church based on the kind or variety of its religious belief. Some religions will qualify and some will not, but this depends on the source of their contributions, not on their brand of religion.

To say that the rule on its face represents an explicit and deliberate preference for some religious beliefs over others is not credible. The Court offers no support for this assertion other than to agree with the Court of Appeals that the limitation might burden the less well organized denominations. This conclusion, itself, is a product of assumption and speculation. It is contrary to what the State insists is readily evident from a list of those charitable organizations that have registered under the Act and of those that are exempt. It is claimed that both categories include not only well-estab-

lished, but also not so well-established, organizations. The Court appears to concede that the Minnesota law at issue does not constitute an establishment of religion merely because it has a disparate impact. An intentional preference must be expressed. To find that intention on the face of the provision at issue here seems to me to be patently wrong.

Third, I cannot join the Court's easy rejection of the State's submission that a valid secular purpose justifies basing the exemption on the percentage of external funding. Like the Court of Appeals, the majority accepts the prevention of fraudulent solicitation as a valid, even compelling, secular interest. Hence, charities, including religious organizations, may be required to register if the State chooses to insist. But here the State has excused those classes of charities it thought had adequate substitute safeguards or for some other reason had reduced the risk which is being guarded against. Among those exempted are various patriotic and fraternal organizations that depend only on their members for contributions. The Court of Appeals did not question the validity of this exemption because of the built-in safeguards of membership funding. The Court of Appeals, however, would not extend the same reasoning to permit the State to exempt religious organizations receiving more than half of their contributions from their members while denying exemption to those who rely on the public to a greater extent. This Court, preferring its own judgment of the realities of fundraising by religious organizations to that of the state legislature, also rejects the State's submission that organizations depending on their members for more than half of their funds do not pose the same degree of danger as other religious organizations. In the course of doing so, the Court expressly disagrees with the notion that members in general can be relied upon to control their organizations.[2]

---

[2] This observation would appear to call into question the exemption of charitable organizations raising all of their funds from their members: since

I do not share the Court's view of our omniscience. The State has the same interest in requiring registration by organizations soliciting most of their funds from the public as it would have in requiring any charitable organization to register, including a religious organization, if it wants to solicit funds. And if the State determines that its interest in preventing fraud does not extend to those who do not raise a majority of their funds from the public, its interest in imposing the requirement on others is not thereby reduced in the least. Furthermore, as the State suggests, the legislature thought it made good sense, and the courts, including this one, should not so readily disagree.

Fourth, and finally, the Court agrees with the Court of Appeals and the District Court that the exemption must be extended to all religious organizations. The Court of Appeals noted that the exemption provision, so construed, could be said to prefer religious organizations over nonreligious organizations and hence amount to an establishment of religion. Nevertheless, the Court of Appeals did not further address the question, and the Court says nothing of it now. Arguably, however, there is a more evident secular reason for exempting religious organizations who rely on their members to a great extent than there is to exempt all religious organizations, including those who raise all or nearly all of their funds from the public.

Without an adequate factual basis, the majority concludes that the provision in question deliberately prefers some religious denominations to others. Without an adequate factual basis, it rejects the justifications offered by the State. It reaches its conclusions by applying a legal standard different from that considered by either of the courts below.

I would reverse the judgment of the Court of Appeals.

---

members cannot be relied upon to control their organization's fundraising activities so as to prevent fraud, why should those organizations be entitled to an exemption when others are not?

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

From the earliest days of the Republic it has been recognized that "[t]his Court is without power to give advisory opinions. *Hayburn's Case*, 2 Dall. 409 [(1792)]." *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461 (1945). The logical corollary of this limitation has been the Court's "long . . . considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision." *Ibid.* (citations omitted). Such fundamental principles notwithstanding, the Court today delivers what is at best an advisory constitutional pronouncement. The advisory character of the pronouncement is all but conceded by the Court itself, when it acknowledges in the closing footnote of its opinion that appellees must still "prove that the Unification Church is a religious organization within the meaning of the Act" before they can avail themselves of the Court's extension of the exemption contained in the Minnesota statute. Because I find the Court's standing analysis wholly unconvincing, I respectfully dissent.

I

Part II of the Court's opinion concludes that appellees have standing to challenge § 309.515, subd. 1(b), of the Minnesota Charitable Solicitations Act (Act), because they have "plainly met" the case-or-controversy requirements of Art. III. *Ante*, at 239. This conclusion is wrong. Its error can best be demonstrated by first reviewing three factual aspects of the case which are either misstated or disregarded in the Court's opinion.

First, the Act applies to appellees not by virtue of the "fifty percent rule," but by virtue of § 309.52. That provision requires "charitable organizations" to register with the Securities and Real Estate Division of the Minnesota Department of Commerce. The Holy Spirit Association for the

Unification of World Christianity (Association) constitutes such a "charitable organization" because it "engages in or purports to engage in solicitation" for a "religious . . . purpose." § 309.50, subds. 3 and 4 (Supp. 1982). Only after an organization is brought within the coverage of the Act by § 309.52 does the question of exemption arise. The exemption provided by the fifty percent rule of § 309.515, subd. 1(b), one of several exemptions within the Act, applies only to "religious organizations." Thus, unless the Association is a "religious organization" within the meaning of the Act, the fifty percent rule has absolutely nothing to do with the Association's duty to register and report as a "charitable organization" soliciting funds in Minnesota. This more-than-semantic distinction apparently is misunderstood by the Court, for it repeatedly asserts that the Association is required to register "under the Act *by virtue of* the fifty per cent rule in § 309.515, subd. 1(b)." *Ante*, at 240 (emphasis added).[1]

Second, the State's effort to enforce the Act against the Association was based upon the Association's status as a "charitable organization" within the meaning of § 309.52. The State initially sought registration from the Association by letter: "From the nature of your solicitation it appears that [the Association] must complete a Charitable Organization Registration Statement and submit it to the Minnesota Department of Commerce." Exhibit A to Affidavit of Susan

---

[1] The examples of this error by the Court are numerous. The Court speaks of the Act "as applied to [appellees] *through* § 309.515, subd. 1(b)'s fifty per cent rule," *ante*, at 233 (emphasis added), "the application of the Act to the Church *through* § 309.515, subd. 1(b)'s fifty per cent rule," *ante*, at 234 (emphasis added), the State's attempt to enforce the Act against the appellees "in express and exclusive reliance upon the newly enacted fifty per cent rule of § 309.515, subd. 1(b)," *ante*, at 239, and the State's "attemp[t] to use § 309.515, subd. 1(b)'s fifty per cent rule in order to compel the Unification Church to register and report under the Act," *ante*, at 241. In addition, the Court holds that because the fifty percent rule is unconstitutional, the "appellees cannot be compelled to register and report under the Act *on the strength of that provision*," *ante*, at 255 (emphasis added).

E. Fortney, Legal Assistant, Staff of Attorney General of Minnesota, Nov. 2, 1978 (Fortney Affidavit). When the Association failed to register within the allotted time, the State commenced "routine enforcement procedures," Fortney Affidavit, at 2, by filing a complaint in Minnesota state court. The complaint alleges that "charitable organizations" are required by § 309.52 to register with the State, that the Association comes within the § 309.50, subd. 4, definition of "charitable organizations," and that "[t]he [Association] has failed to file a registration statement and financial information with the Minnesota Department of Commerce, resulting in a violation of Minn. Stat. § 309.52." Exhibit F to Fortney Affidavit, at 3.[2] This complaint, which never once mentions the fifty percent rule of § 309.515, subd. 1(b), nor characterizes the Association as a "religious organization," is still pending in Minnesota District Court, having been stayed by stipulation of the parties to this lawsuit. Because today's decision does nothing to impair the statutory basis of the complaint, or the State's reason for filing it, the State may proceed with its enforcement action before the ink on this Court's judgment is dry.[3]

---

[2] The Court errs when it concludes that the basis for the State's enforcement action was the fifty percent rule of § 309.515, subd. 1(b). See *ante*, at 232, 241. The Court bases this conclusion on a letter to the Association from Legal Assistant Fortney which referred to the fifty percent rule while informing the Association of its obligation to register under the Act. See *ante*, at 232–233, n. 4. The Court apparently concludes from this letter that it was the fifty percent rule which motivated the State to seek registration from the Association. Certainly the imprecise implications of a letter from a Legal Assistant in the Attorney General's Office do not establish the motive behind the State's enforcement action. More importantly, the reason for the State's action was expressly alleged in the enforcement complaint: the Association is a charitable organization soliciting funds in Minnesota. See Exhibit F to Fortney Affidavit. Even if the State had been motivated by the narrowing of the religious organization exemption, however, that would not alter the legal basis for enforcement of the statute against appellees or the analysis of appellees' standing before this Court.

[3] It is not surprising that the Court's opinion never once mentions this enforcement complaint. That the complaint is pending in the Minnesota

Third, appellees have never proved, and the lower courts have never found, that the Association is a "religious organization" for purposes of the fifty percent rule. The District Court expressly declined to make such a finding—"This court is not presently in a position to rule whether the [Association] is, in fact, a religious organization within the Act," App. to Juris. Statement A–47—and the Court of Appeals was content to decide the case despite the presence of this "'unresolved factual dispute concerning the true character of [appellees'] organization,'" 637 F. 2d 562, 565 (CA8 1981) (quoting *Village of Schaumburg* v. *Citizens for Better Environment*, 444 U. S. 620, 633 (1980)). The absence of such a finding is significant, for it is by no means clear that the Association would constitute a "religious organization" for purposes of the § 309.515, subd. 1(b), exemption. The appellees' assertion in the District Court that their actions were religious was "directly contradict[ed]" by a "heavy testimonial barrage against the [Association's] claim that it is a religion." App. to Juris. Statement A–46.[4]

---

District Court, and that it relies entirely upon the Association's status as a "charitable organization" within the meaning of § 309.52, altogether refute the Court's assertion that the fifty percent "rule was the sole basis for the State's attempt to compel registration," and the consequent conclusion that invalidation of the rule will mean that "the Church cannot be required to register and report under the Act." *Ante*, at 242. As has already been demonstrated, invalidation of the fifty percent rule will have absolutely no effect on the Association's obligation to register and report as a *charitable organization* under the Act. See *supra*, at 265–266. Indeed, the Court's decision today will not even require the State to amend its complaint before proceeding with its enforcement action.

[4] Apparently forgetting that our role does not include finding facts, the Court finds itself "compel[led]" to conclude that "the Church is indeed a religious organization within the meaning of the Act." *Ante*, at 241. The Court's compulsion to disregard its purely appellate function is caused not by evidence adduced in the District Court, but by the faulty premise which underlies the Court's entire standing analysis: that "appellants chose to apply § 309.515, subd. 1(b), and its fifty per cent rule as the sole statutory authority requiring the Church to register under the Act." *Ibid.* The

## II

The Court's opinion recognizes that the proper standing of appellees in this case is a constitutional prerequisite to the exercise of our Art. III power. See *ante*, at 238–239. To invoke that power, appellees must satisfy Art. III's case-or-controversy requirement by showing that they have a personal stake in the outcome of the controversy, consisting of a distinct and palpable injury. *Ibid.* See also *Glad-*

---

utter error of that premise has already been demonstrated. See *supra*, at 264–265. But even if one accepts the premise that the State acted because it considered the Association to be a "religious organization" for purposes of the fifty percent rule, that premise cannot properly lead to the conclusion that the Association is *in fact* such an organization. Factual determinations of that sort are to be made by state courts construing the Minnesota statute, not by attorneys in the Minnesota Attorney General's office. And if the Court is saying that the Attorney General has "admitted" by its enforcement action that the Association is a "religious organization" within the meaning of the Act, it has ventured into a realm of state evidentiary law in which it has no competence and no business. It is worth noting that even the Court of Appeals did not take such liberties with the record. It held that the " 'bare assertion . . . without the production of any evidence . . . is simply not sufficient to sustain [an] assertion that [the Unification Church] is a religious organization.' " 637 F. 2d 562, 570 (CA8 1981) (quoting *United States* v. *Berg*, 636 F. 2d 203, 205 (CA8 1980)).

Even more questionable than this finding of fact is the judicial wizardry by which the Court shifts the state-created burden of proof. The Court concludes, without citation to supporting authority, that "a declaration that § 309.515, subd. 1(b)'s fifty percent rule is unconstitutional would put the *State* to the task of demonstrating that the Unification Church is *not* a religious organization within the meaning of the Act." *Ante*, at 243 (emphasis added). This conclusion directly conflicts with the Minnesota statute, which requires registration and reporting under the Act if the State demonstrates that an organization is "charitable" within the meaning of § 309.52. See *supra*, at 265–266. It then becomes incumbent on the organization to show that it qualifies for one of the Act's several exemptions—in this case to show that it is a "religious organization" within the meaning of § 309.515, subd. 1(b). The Court cannot change this state regulatory scheme by judicial fiat, and does so only in a transparent attempt to manufacture redressability where none exists. See *infra*, at 269–271.

*stone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 99 (1979); *Duke Power Co.* v. *Carolina Environmental Study Group*, 438 U. S. 59, 72 (1978). I do not disagree with the Court's conclusion that the threatened application of the Act to appellees constitutes injury in fact.

But injury in fact is not the only requirement of Art. III. The appellees must also show that their injury "fairly can be traced to the challenged action of the defendant." *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 41 (1976). The Court purports to find such causation by use of the following sophism: "there is a fairly traceable causal connection between the claimed injury and the challenged conduct—here, between the claimed disabling and the threatened application of § 309.515, subd. 1(b), and its fifty per cent rule." *Ante*, at 241.

As was demonstrated above, the statute and the State require the Association to register because it is a "charitable organization" under § 309.52, not because of the fifty percent requirement contained in the exemption for religious organizations. Indeed, at this point in the litigation the fifty percent rule is entirely inapplicable to appellees because they have not shown that the Association is a "religious organization." Therefore, any injury to appellees resulting from the registration and reporting requirements is *caused* by § 309.52, not, as the Court concludes, by "the . . . threatened application of § 309.515, subd. 1(b)'s fifty per cent rule." *Ante*, at 242. Having failed to establish that the fifty percent rule is causally connected to their injury, appellees at this point lack standing to challenge it.

The error of the Court's analysis is even more clearly demonstrated by a closely related and equally essential requirement of Art. III. In addition to demonstrating an injury which is caused by the challenged provision, appellees must show "that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co.* v. *Carolina Environmental Study Group, supra*, at 74. The importance

of redressability, an aspect of standing which has been recognized repeatedly by this Court,[5] is of constitutional dimension:

> "[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon* v. *Eastern Kentucky Welfare Rights Org., supra,* at 38.

Appellees have failed to show that a favorable decision of this Court will redress the injuries of which they complain. By affirming the decision of the Court of Appeals, the Court today extends the exemption of § 309.515, subd. 1(b), to all "religious organizations" soliciting funds in Minnesota. See 637 F. 2d, at 569–570. But because appellees have not shown that the Association is a "religious organization" under that provision, they have not shown that they will be entitled to this newly expanded exemption.[6] This uncertainty is expressly recognized by the Court:

---

[5] See *Valley Forge Christian College* v. *Americans United for Separation of Church and State,* 454 U. S. 464, 472 (1981); *Watt* v. *Energy Action Educational Foundation,* 454 U. S. 151, 161 (1981); *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 100 (1979); *Duke Power Co.* v. *Carolina Environmental Study Group,* 438 U. S., at 74, 75, n. 20; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 262 (1977); *Warth* v. *Seldin,* 422 U. S. 490, 504, 507–508 (1975); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 618 (1973).

[6] The Court attempts to finesse this fact by stating: "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Ante,* at 244, n. 15 (emphasis in original). True though this statement may be, appellees have failed to demonstrate that a favorable decision in this Court will relieve *any* injury. The Court's decision does not alter the statutory requirement that the As-

"We agree with the Court of Appeals that appellees and others claiming the benefits of the religious-organization exemption should not automatically enjoy those benefits. Rather, in order to receive them, appellees may be required by the State to prove that the Unification Church is a religious organization within the meaning of the Act." *Ante*, at 255, n. 30 (citation omitted).[7]

If the appellees fail in this proof—a distinct possibility given the State's "heavy testimonial barrage against [the Association's] claim that it is a religion," App. to Juris. Statement A–46—this Court will have rendered a purely advisory opinion. In so doing, it will have struck down a state statute at the behest of a party without standing, contrary to the undeviating teaching of the cases previously cited. Those cases, I believe, require remand for a determination of whether the Association is a "religious organization" as that term is used in the Minnesota statute.

## III

There can be no doubt about the impropriety of the Court's action this day. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor*

sociation register under the Act, and expands an exemption from which appellees can benefit *only* when they prove that the Association is a "religious organization" within the meaning of the Act.

[7] At another point in its opinion, the Court acknowledges:

"Of course, the Church cannot be assured of a continued religious-organization exemption even in the absence of the fifty per cent rule. . . . But that fact by no means detracts from the palpability of [appellees' injury.]" *Ante*, at 242 (citation omitted).

I agree that the uncertainty as to whether this decision will benefit appellees does not detract from the "palpability" of their injury. As shown in the text, however, it detracts totally from their ability to demonstrate the essential Art. III requirements of causation and redressability.

*Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105 (1944). Nowhere does this doctrine have more force than in cases such as this one, where the defect is a possible lack of Art. III jurisdiction due to want of standing on the part of the party which seeks the adjudication.

> "Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of [legislative Acts] unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Blair* v. *United States,* 250 U. S. 273, 279 (1919), quoted in *Ashwander* v. *TVA,* 297 U. S. 288, 341 (1936) (Brandeis, J., concurring).

The existence of injury in fact does not alone suffice to establish such an interest. "The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies." *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S., at 39.

## IV

In sum, the Court errs when it finds that appellees have standing to challenge the constitutionality of § 309.515, subd. 1(b). Although injured to be sure, appellees have not demonstrated that their injury was caused by the fifty percent rule or will be redressed by its invalidation. This is not to say that appellees can never prove causation or redressability, only that they have not done so at this point. The case should be remanded to permit such proof. Until such time as the requirements of Art. III clearly have been satisfied, this Court should refrain from rendering significant constitutional decisions.