The CHRISTIAN JEW FOUNDATION
(Formerly the Christian Jew
Hour), Appellant,

v.

The STATE of Texas, et al., Appellees.

No. 13542.

Court of Appeals of Texas,
Austin.

May 18, 1983.

Rehearing Denied June 29, 1983.

Harvey L. Hardy, Philip E. Hamner, San Antonio, for appellant.

Mark White, Atty. Gen., Diane Van Helden, Asst. Atty. Gen., Austin, for appellees.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

POWERS, Justice.

Appellant, The Christian Jew Foundation, a non-profit corporation organized and existing under the laws of the State of Texas, appeals from a money judgment entered against it in a suit by the State of Texas for unpaid employer's contributions to the Unemployment Compensation Fund. The fund is administered by the Texas Employment Commission. Tex.Rev.Civ.Stat.Ann. arts. 5221b–5 (1971 and Supp.1982), 5221b–7 (1971).

The Foundation defended the suit on the ground that it was not required to make contributions to the Unemployment Compensation Fund because the services rendered by its employees did not constitute "employment," as they were performed in the employ of a "church" within the meaning of Tex.Rev.Civ.Stat.Ann. art. 5221b–17(g)(5)(E) (Supp.1982). That statute excludes from the term "employment" certain employee services described as follows:

(5) The term "employment" shall not include:

\* \* \* \* \* \*

(E) Service performed in the employ of a church, convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches.

In the alternative, the Foundation contended that if it was deemed not to be a "church" within the meaning of the statute, then the statute is discriminatory and in violation of certain guarantees of religious freedom contained in Article I, Section 6 of the Constitution of the State of Texas and the First and Fourteenth Amendments to the Constitution of the United States.[1] The same contentions are urged on appeal in various points of error.

The Foundation admitted in the trial court that the exclusion provided by art.

1. Article I, Section 6 of the Constitution of the State of Texas provides in part as follows: All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to ... erect or support any place of worship, or to maintain any ministry against his consent.... [N]o preference shall ever be given by law to any religious society or mode of worship....

Tex.Const.Ann. art. I, § 6 (1955).
The First Amendment to the Constitution of the United States, applicable to the States through the Fourteenth Amendment, provides in part as follows:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ...
U.S.Const. amend. I.

5221b–17(g)(5)(E) did not apply to the Foundation beyond the exclusion given therein to a "church"; but the Foundation argued vigorously that it was indeed a "church" within the article. The State's suit for the past-due contributions followed within a year the Commission's determination, after a "tax coverage hearing," that the Foundation was not a "church" within the meaning of the statute. The Commission's decision took the form of a letter to the Foundation. The letter set forth the following basis for the Commission's determination:

> The word "church" is not defined in the [Texas Unemployment Compensation Act] and the Commission has not adopted any rules defining the word. Therefore, the word must be given its ordinary meaning considering the context in which it is used. In the context in which the word is used, Webster's New Collegiate Dictionary defines "church" as a body of Christian believers having the same creed, rights [sic], etc. We conclude that the meaning intended by the Legislature was that expressed in the definition above. Therefore, we must conclude that the Christian Jew Foundation is not a church as described above because it is not a body of Christian believers having the same creed, rights [sic], etc.[2]

The letter was included in a series of stipulations by the parties, filed in the trial court, the general effect of which was that the State was entitled to recover in the suit unless the Foundation established that it was a "church" within the meaning of the article. The trial court concluded that the Foundation was subject to the mandatory contributions imposed upon employers by the Texas Unemployment Compensation Act. The necessary implication of that conclusion is, of course, that the Foundation was held not to be a "church" within the meaning of art. 5221b–17(g)(5)(E), although the trial court made no such express determination.

The trial court's findings of fact and the undisputed evidence established the nature of the Foundation and the activities conducted by it from its main office in the City of San Antonio, Bexar County, Texas. The purposes of the Foundation, stated in its articles of incorporation, are to propagate the gospel of Jesus Christ through radio and television broadcasts and printed material and to give support to Christian missions and missionaries. The Foundation's articles of incorporation provide for "members," as permitted but not required by the Texas Non-Profit Corporation Act, Tex. Rev.Civ.Stat.Ann. art. 1396–2.08 (1980), the word "member" in this context being defined as "one having membership rights in [the] corporation in accordance with the provisions of its articles of incorporation or its by-laws." Tex.Rev.Civ.Stat.Ann. art. 1396–1.02(A)(6) (1980). The Foundation owns property which would be subject to *ad valorem* taxation by the City of San Antonio and Bexar County, but for tax exemptions granted by those authorities, based upon the religious use to which the Foundation's property is devoted and based upon the religious character of the Foundation as an organization. *See* Tex.Tax Code Ann. § 11.20 (1982). Money received by the Foundation as contributions from the public is exempt from the federal income tax, the Foundation having been determined to be an organization operated exclusively for religious purposes. 26 U.S.C.A. § 501(c)(3) (Supp.1982). Finally, the Foundation has been determined by the Comptroller of Public Accounts to be "an organization created for religious ... purposes," and therefore exempt from the taxes imposed by the Limited Sales, Excise, and Use Tax Act. Tex.Tax Code Ann. § 151.310 (1982).

The Foundation employs in its San Antonio office twenty-six employees who perform clerical, secretarial, bookkeeping, and similar office tasks. In addition, it employs three executive or management-level employees. Each of the three is an "ordained Baptist minister," which is to say that each has been appointed a clergyman. The appointment in each case was by a different local church having the word "Baptist" in

---

**2.** The word "rights" should evidently be "rites," and we will so treat it herein.

its name; and each appointing church is situated in a different part of the United States. Each of the three ministers is a graduate of one or more religious seminaries. One of the ministers serves as "director" of the Foundation. He prepares Biblical discourses, some of which are recorded for radio broadcast over numerous radio stations from which the Foundation purchases broadcast time; other discourses are printed in booklet form and distributed free of charge to those of the public who request them. The director also generally manages the Foundation's affairs. The second minister also prepares Biblical discourses that are similarly broadcast or published in booklet form for free distribution and he conducts as well weekly Bible classes in a "chapel" situated within a building owned by the Foundation in San Antonio. The third minister apparently performs only counseling duties on request therefor by members of the public who come in contact with the Foundation. Two of the ministers are "members" of "Baptist" churches in San Antonio where they regularly attend services. The Foundation employs twenty "missionaries" who propagate the gospel of Jesus Christ outside Texas and in foreign countries. In addition to the booklets mentioned above, the Foundation publishes a bi-monthly "paper" for which it receives from subscribers a voluntary annual payment of three dollars. The content of all radio broadcasts, publications, and Bible classes is strictly spiritual with some emphasis on converting Jews to Christianity. The Foundation's Bible classes, broadcasts, and publications occupy an important place in the spiritual life of three witnesses who testified at trial, one of whom equated the Foundation's messages to her "spiritual

food," while another stated that she got "all of her inspiration from them."

The Bible classes mentioned above are open to the public. There are ordinarily about fifteen to twenty people in attendance. Some individuals attend regularly and some on an occasional basis. There are also visitors who merely walk into the chapel from the street to attend only one class. Of those who attend regularly, some are "members" of other churches. The meetings open with religious songs and prayer, followed by the central activity which is an exegetical and topical study of the Bible, chapter by chapter and verse by verse. The meetings last about an hour and a half and close with a prayer.

A booklet introduced in evidence sets forth the spiritual tenets which have governed the Foundation's activities since its beginning and which form the framework of the doctrine which it communicates in its broadcasts, publications, and Bible classes. The director described these tenets as the guiding principles of the Foundation and the beliefs which it seeks to propagate. Suffice it to say, for our purposes, that these tenets reflect historic, basic, and mainstream Christian doctrine, known to be held in one or more points by most Christian denominations and by other Christian churches which are independent of the legal or administrative control of a particular denomination or sect.[3] A divergence of opinion about one or more such points is, of course, a matter consistent with the individual volition, privacy, and freedom of conscience guaranteed by the First Amendment.

The Foundation is successful in its evangelical and Bible-teaching efforts, for it has grown steadily and receives voluntary con-

---

**3.** The booklet reflects that those who adhere to the Foundation's positions in religious matters believe in the following: the Bible as given in the Old and New Testaments is the inspired and infallible Word of God; God consists in the Father, Son, and Holy Spirit; Jesus Christ is deity, he was born of a virgin, he was resurrected, and his pre-millennial return to earth is imminent; salvation is solely by grace apart from works; God chose and elected before the beginning of the ages those who would be

saved; Jesus Christ shed his blood for the remission of sins; the believer (in Christ) is eternally secure; the true church is composed of all born-again believers of this present dispensation (or epoch); the "ecumenical" movement of the present day is unscriptural and true believers should separate from it; and in the literal interpretation of the (Biblical) prophecies which forecast and assure Israel's future regeneration and restoration.

tributions from the public equal to some $1,500,000 annually, practically all of which is spent to meet operational expenses, including reasonable salaries paid to its employees.

While the State apparently concedes the religious nature of the Foundation's activities, it denies that these activities constitute the Foundation a "church" within the exclusion granted by art. 5221b–17(g)(5)(E). The State introduced no evidence at trial in support of its position that the Foundation is not a "church" within the meaning of the statute, being content evidently to have the matter considered as a question of law applicable to undisputed facts. The State's position on appeal may be gathered from the contentions in its brief, quoting from a treatise applicable to the Internal Revenue Code that lists the criteria by which it is suggested we should decide whether the Foundation is a "church." According to that treatise, a "church" is characterized by:

> (1) a distinct legal existence, (2) a recognized creed and form of worship, (3) a definite and distinct ecclesiastical government, (4) a formal code of doctrine and discipline, (5) a distinct religious history, (6) a membership not associated with any church or denomination, (7) a complete organization of ordained ministers ministering to their congregations and selected after completing prescribed courses of study, (8) a literature of its own, (9) established places of worship, (10) regular congregations, (11) regular religious services, (12) Sunday schools for the religious instruction of the young, and (13) schools for the preparation of its ministers.

Hopkins and Meyers, The Law of Tax Exempt Organizations (1975). (We note that the Foundation has been granted an exemption from the federal income tax and was evidently viewed, at least by the Internal Revenue Service, as having met a sufficient number of the foregoing criteria.) The State contends the trial court's implied finding that the Foundation is not a church is amply supported by certain portions of the undisputed evidence. Before discussing that evidence, we observe that the State's argument rests almost entirely upon premises and word meanings which are neither self-evident, established as a matter of law, nor the subject of evidence adduced at trial.

The State points out that the Foundation does not "prepare its own ministers"; the director of the Foundation "was unable to articulate tenets and doctrines which would indicate that appellant possesses a recognized, distinct creed"; the Foundation's "members and employees are associated with other churches"; "[n]o identifiable ministry, unique to [the Foundation] has developed"; "[n]o established places of worship exist"; "[a]part from bible study classes, no regular religious services per se [sic] or sunday schools are held"; and the Foundation has only twelve members at present and "applications for membership must be passed on [sic] by the Board of Directors." The State acknowledges that not all the criteria recited by Hopkins and Meyers, *supra,* are required to be present in a particular case; the State contends, nevertheless, that these criteria imply an "organizational formality" which is not possessed by the Foundation. We assume that the State refers not to the Foundation, which appears to be under the undisputed evidence a well-organized non-profit corporation, but to an absence of "organizational formality" in the religious activities which the Foundation conducts and subsidizes. While the State's position is exceedingly opaque, the various defects that it attributes to the Foundation's activities apparently reduce to a claim that the Foundation is not a church because of whatever meaning the State subjectively intends when it uses such terms as "tenets and doctrines," a "recognized" and "distinct" creed, "identifiable ministry," "established places of worship," "religious services per se," "church membership," and "organizational formality." Our conclusion is derived from a comparison of these contentions with the evidence adduced at trial, some of which we have summarized above.

Contrary to the State's position, we find the evidence undisputed that the director of the Foundation did indeed "articulate" ten-

ets and doctrines of a recognized and distinct creed, that of Christianity. The director expressly ratified and endorsed the principles and beliefs we have summarized in footnote 3, asserting them to be the principles and beliefs which govern the Foundation's evangelical and Bible instruction work or "ministry." Moreover, he testified that the Foundation's "ministers" baptized people although they "do not go in for [other] rituals and ceremonies." When asked whether the Foundation's activities include "any rights [sic] or sacraments," he answered in the affirmative by saying that they included prayer ("the Christian's greatest work"), Bible study ("through which God speaks"), and the well-known sacrament of "communion," or "The Lord's Supper."[4]

We do not understand the distinction that the State draws between "Bible study classes" and "regular religious services per se." Quite obviously, however, the distinction rests upon the subjective understanding or belief held by the State's advocate as to what constitutes "regular religious services per se." The same may be said of the term "identifiable ministry," for the record shows without dispute vigorous evangelical and Bible-teaching efforts by the Foundation, which constitute in fact the final sum of all its activities. And the State's contention relative to a "recognized" and "distinct" creed rests similarly upon the State's unarticulated assumption as to what constitutes such a "creed."

While we cannot fathom the reasoning which underlies the State's usage of the ideas and terms mentioned above, we are able somewhat to understand its contention that the Foundation has no "established places of worship," if we ignore the essential vagueness implicit in the words "established" and "worship." Evidently, the State argues that the Foundation has no physical place for the conduct of its religious activities. We find, in contrast, uncontroverted evidence that the Foundation uses its chapel each week for topical and exegetical teaching from the Bible, "through which God speaks." Thus, the State's conclusion is false under the evidence, but even if the Foundation did not use its chapel for the stated purpose, or if its use of the chapel for such purpose be considered *de minimis,* this would be irrelevant to the pertinent issue of whether the totality of the Foundation's activities constituted it a church.

Turning from the particulars of the State's position in the case, we ascertain from the entirety of its argument on appeal some general themes advocated in support of the trial court's judgment. They are as follows: (1) the Foundation cannot be a "church" because it devotes a disproportionately large part of its activities to propagating its beliefs through written publications and radio broadcasts, and a disproportionately small part to propagating those beliefs through missionaries, house-to-house visits, and Bible classes, that is to say, through the conventional method of face-to-face communication, as before an auditorium audience on Sunday or some other day of the week, which is the custom among many denominations, sects, and independent Christian churches. While the relative proportions of the Foundation's total activities have not been broken out in the evidence, in this regard, the disparity is evident—several thousand people listen to the radio broadcasts and receive the Foundation's publications while only about fifteen to twenty people attend its Bible classes. (2) The corporation, which conducts the ac-

---

4. Again, the word "rights" should evidently be "rites." The State has not suggested the rites, ceremonies, or sacraments that the Foundation omits to observe but which are necessary for it to fall within the category of a "church" under the definition of the Texas Employment Commission, that is, "a body of Christian believers having the same creed, rights [sic], etc." The concluding *et cetera* invites the widest range of possibilities, to include perhaps penance, confession of sin to a church functionary, speaking in tongues, marriage and burial ceremonies, circumcision, kneeling for prayer, wearing of head coverings, things or activities designed to produce euphoria, observance of certain days and times, fasting, prohibited foods or the consumption of only sanctioned foods, sacrifice, mortification of the body, celibacy of functionaries, and still other possible exercises, usages, customs and symbols.

tivities, has only twelve "members," perhaps a rather small number. (3) The religious activities of the Foundation are not under the auspices of any recognized denomination or sect, but are conducted independent of any legal or administrative control outside the Foundation itself.

We find the foregoing matters to be entirely weightless in resolving the issue of whether the Foundation is a "church" within the meaning of the Texas statute. Moreover, these matters imply the State's exercise of constitutionally impermissible distinctions between the conventional and the unconventional in applying the statutory exclusion.

The issue of denominational or sectarian affiliation is irrelevant for there is no religious monopoly under the First Amendment, a matter to be discussed presently.[5] The issue of the existence of a formal affiliation between the Foundation and its members or adherents is also irrelevant. It would be impossible to apply the statutory exclusion based upon a distinction between the number of persons involved in the governance and administration of the organization and those whose affiliation, however informal, is solely for spiritual purposes, that is, to receive with some degree of regularity instruction in the organization's publicly professed doctrine through publications and radio broadcasts. A voluntary religious association that chooses not to incorporate but to operate informally under rules or tacit understandings made by custom, usage, or practice, may nonetheless be a "church." *See, e.g., Jones v. Johnson,* 353 S.W.2d 82, 83–84 (Tex.Civ.App.1962, writ ref'd n.r.e.). Similarly, there is no weight in the matter of whether a religious organization expends a given percentage of its total effort in communicating to a distant and diffused audience as compared to the percentage expended in face-to-face teaching in an auditorium or other room, or on a mountain top or under a tent or brush arbor for that matter. There are enormous constitutional problems in making the statutory exclusion depend upon such factors. Where shall the lines be drawn, at ten "members" or at twelve, at fifty percent of total organizational activity or at some other percentage? What denominations or sects shall be sufficient for affiliation purposes and which shall not? When does a

**5.** We are uncertain as to why the State attributes any significance to the idea of affiliation with a recognized denomination or sect, or how that fact adds to the validity of a claim to the statutory exclusion. There is, for example, no such thing as a general "Baptist Church" having authority to prescribe and enforce uniform requirements among "Baptist" churches in matters either of doctrine or government. *See Crenshaw v. Muse,* 118 S.W.2d 631, 633 (Tex. Civ.App.1938, no writ) and *Fort v. First Baptist Church,* 55 S.W. 402, 407 (Tex.Civ.App.1899, no writ). The following passage from the latter decision is instructive:

> The Baptist denomination has certain fundamental tenets of faith, which differentiate that denomination from other evangelical denominations, and these are uniformly adopted and propagated by the various independent churches of that denomination. But each church adopts its own creed of religious faith, prescribes its own system of church government, discipline, and practice, and there is no ruling or controlling authority above it in any of these respects. The congregation or membership in each church is supreme and sovereign in all such matters. It is the theory of their organization that they find in the New Testament Scriptures their

creed of religious faith and model of church government, and each member is conceded the liberty of individual interpretation, limited only by the right of the majority to control in all church action. The church usually formulates and adopts a creed of faith, which sets forth the essential doctrines of the New Testament, as interpreted and understood by the majority of the membership of the particular church.

Obviously, the case may be different in a presbyterian or episcopal system of which a local church is a part. *See Brown v. Clark,* 102 Tex. 323, 116 S.W. 360 (Tex.1909); *Blanc v. Alsbury,* 63 Tex. 489 (1885). Given the various possibilities, however, we do not see that denominational affiliation has any significance— if a local "Baptist" church is autonomous in matters both of doctrine and of government, and remains a "church" nevertheless, then the same must be said of the Foundation in the present case, which is shown by the undisputed evidence to be of the same character. This does not prevent a local organization from being a "church" if it *is* affiliated with a presbyterian or episcopal system, of course. The issue of denominational or sectarian affiliation appears to be essentially meaningless for our present purposes.

given organization become itself a "denomination" or a "sect?" What are the aspects of the formal affiliation agreement by which it shall be determined that one is a "member," either of the organization or of the denomination or sect? What factors shall measure and determine a sufficient or proper division of organizational effort between face-to-face teaching of the organization's doctrine and other forms of communicating that doctrine through advocacy and instruction? Shall we in effect limit individuals to membership in only one church or forbid attendance at more than one church by permitting only one such relationship to count for regulatory purposes or for the determination of legal rights?

Were the State to give effect to the foregoing, the resulting constitutional infirmity would be obvious. *See Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 1684, 72 L.Ed.2d 33 (1982).

In summary, we have found the State's reasoning, as reflected in its brief on appeal, to be less than helpful in any direct and meaningful handling of the problem of statutory interpretation with which we are presented, which is to assign to the word "church," as it is used in art. 5221b–17(g)(5)(E), the meaning intended by the Legislature, and to this we now turn.

We have discussed the State's position in the first part of this opinion because: (1) a considerable burden rests upon the State when it questions a claim of a religious nature; (2) a strict or narrow construction of a statutory exclusion in favor of religious organizations is not favored; and (3) the Texas Employment Commission's denial of the Foundation's claim to the exclusion, based upon its administrative determination of what constitutes a "church" within the meaning of the statute, results in a clear preference among religious beliefs, rendering the statute suspect and the subject of strict scrutiny to determine its constitutionality if the Commission's interpretation be an accurate determination of legislative intent. *Larson v. Valente, supra.*

We assume a general secular purpose and neutral effect in art. 5221b–17(g)(5)(E) because, in addition to "churches" and other religious organizations, the statute excludes from mandatory contributions *other* specific categories of employers of a special character, negating any implication that the Legislature has attempted to single out religious organizations for special favor. *See* 26 U.S.C.A. § 3306 (1979 and Supp.1982); Tex.Rev.Civ.Stat.Ann. art. 5221b–17(g)(5); *Walz v. Tax Commission of City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). We will also assume the absence of any prohibited degree of entanglement between the State and an organization which claims to fall within the category of a "church"—we are assured by the State that the requisite determination may in some manner be made by the Texas Employment Commission merely upon the basis of information supplied by the organization claiming an entitlement to be placed in that category, implying that the determination need not result from an appraisal of facts, the exercise of judgment, and the formation of opinion. *Cf., Hoover v. State,* 279 S.W.2d 859, 861 (Tex.Cr.App.1955). However, in the absence of any statutory or regulatory guidelines, we observe that the making of an arbitrary classification is distinctly possible, with a resulting constitutional infirmity in the statute on First Amendment grounds. *See Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Hoover v. State, supra.* Moreover, any statutory or regulatory guidelines which may develop must be coextensive with a compelling State interest. *See Larson v. Valente, supra,* 456 U.S. at 247, 102 S.Ct. at 1684. We need not consider these matters further, however, because we find from the trial court's findings of fact and the undisputed evidence that the Foundation is a "church" within the intended meaning of art. 5221b–17(g)(5)(E) under any constitutionally permissible standard. If any organization may fall within the category delineated by the word "church," as it is used in that statute, then the Foundation must also fall within that category.

We find nothing in art. 5221b–17(g)(5)(E), and nothing in the statutory scheme of which it is a part, which supports the State's interpretation or suggests a legislative intent to distinguish between different denominations, sects, and independent religious bodies, yet such a distinction was unquestionably made by the Texas Employment Commission in its order denying the Foundation's claim to the exclusion because the Commission found that "it is not a body of Christian believers having the same creed, rights [sic], etc." The quoted provision, taken from the Commission's order, is of course altogether unenlightening for several reasons apparent on the face of the quotation, and we need not belabor the rather flagrant unconstitutionality of interpreting art. 5221b–17(g)(5)(E) in a way that requires the exclusion of non-Christian religious bodies from the benefit conferred by the statute. The defect is so obvious that we must assume it to have been unintentional, notwithstanding the rule that where First Amendment freedoms are at stake, precision of drafting and clarity of purpose are required. *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). We pass then to the more subtle discrimination between Christian denominations, sects, and independent religious bodies which the Commission's decision implies and enforces in the present case involving a religious body which is professedly Christian and therefore unaffected by the inadvertent error we have mentioned.

The use of the word "church" in art. 5221b–17(g)(5)(E) derives meaning from its context and purpose. *See, e.g., Equal Employment Opportunity Commission v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir.1981); *Stubbs v. Texas Liquor Control Board,* 166 S.W.2d 178, 180 (Tex.Civ.App.1942, writ ref'd w.o.m.); *Watkins v. Yancey,* 495 S.W.2d 366, 369 (Tex.Civ.App.1973, no writ). While dictionary definitions are often quoted as evidence of the "plain meaning" of a statutory word, we do not see that such definitions are of any value when a term has *more* than one meaning in common

usage and in a given context. In such instances, the statutory purpose is far more salient. *See Kinner Transportation & Enterprises, Inc. v. State,* 644 S.W.2d 69, 70–71 (Tex.App.1982, writ ref'd n.r.e.).

In the present case, the context of the word "church" is found in a statutory scheme which excludes from the required employer contributions certain employers whose employees are engaged in particular activities or services. In the exclusion found in art. 5221b–17(g)(5)(E), a clearly discernible reason for the exclusion is to avoid the possibility of a church-State "entanglement" which might result but for the exclusion. We will not assume that the Legislature, having carefully circumvented this First Amendment pitfall, was oblivious to another such pitfall—that of preferring one denomination, sect, or independent religious body over another. *See Larson v. Valente, supra.* The statute refers, for our purposes, simply to the word "church" and nothing in the statute requires that any distinctions be made along the line of what is conventional and unconventional in the following matters: (1) whether a particular religious body is affiliated with a "recognized" denomination or sect, or whether it is independent thereof; (2) whether a particular religious body communicates a form of Christian doctrine thought by it to be Biblically based or a version of Christian doctrine attended by denominational or sectarian-based distinctions; (3) whether a particular religious body communicates its religious beliefs indirectly through printing and radio broadcasting, or through face-to-face advocacy and instruction in its doctrine, or whether it maintains in that respect some ratio which is satisfactory to the State; (4) whether a particular religious body observes the number and kind of rituals, sacraments, and other symbols or ceremonies considered satisfactory by the State; (5) whether a particular religious body admits to its "membership" a number of persons considered sufficient by the State, whether such "membership" must include formal affiliation with the non-profit corporation which sponsors and conducts the ad-

vocacy and teaching of a particular religious doctrine as its only corporate activities, and whether the particular religious body is precluded from being a "church" because several of its adherents are "members" of other religious organizations, which are presumed without proof to be "churches," and attend services there; and (6) whether a particular religious body meets perhaps still further subjective requirements which may only be inferred from the decision of the Texas Employment Commission and the argument of the State on appeal.

This is not a case involving an issue of tax evasion through a less than *bona fide* claim to the statutory exclusion. *Cf., Ideal Life Church of Lake Elmo v. Washington County,* 304 N.W.2d 308, 317 (Minn.1981) and *Maumee Valley Broadcasting Ass'n v. Porterfield,* 29 Ohio St.2d 95, 279 N.E.2d 863, 865 (Ohio 1972). Nor is it even a case involving a purportedly "religious" activity which might be considered annoying to other citizens or inimical to public health, tranquility, or safety. *Cf., Cantwell v. Connect-*

*icut, supra; Larsen v. Valente, supra.* Rather, the Texas Employment Commission's interpretation of an unambiguous statute seeks to draw the line on the basis of (1) the *content* of the religious beliefs and exercises that the Foundation employs, that is, whether they are denominational or sectarian in character and accompanied by ceremony and other impedimenta considered sufficient by the State, and (2) the *manner* in which the Foundation's beliefs are communicated for the purpose of advocacy and instruction, that is, through a means and structure approved by the State. These are constitutionally impermissible distinctions because they produce directly and flagrantly the political fragmentation along religious lines which the First Amendment was expressly adopted to prevent. *Meek v. Pittenger,* 421 U.S. 349, 372, 95 S.Ct. 1753, 1766, 44 L.Ed.2d 217 (1975); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[6]

We observe that it is only the Commission's interpretation of art. 5221b–

---

**6.** The Establishment and Free Exercise Clauses are, of course, intertwined in a case such as this. "The fullest realization of true religious liberty requires that government ... effect no favoritism among sects ... and that it work deterence of no religious belief." *Abington School District v. Schempp,* 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963). *See also, Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *McDaniel v. Paty,* 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978); *Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). One should think it rather late in the day for the State to attempt to distinguish between the conventional and unconventional in religious advocacy and instruction. The flight by dissenters from the official tax-supported Anglican church in England forms an important part of our constitutional history. It is not so well known that many of them immigrated to the new colonies, destined to form the United States, only to find that with one or two exceptions, all the colonies had official tax-supported churches of their own. Eventually, on formation of the union, the principle of religious freedom prevailed.

The new principle was a distinct departure from an often fevered secular involvement with religion which had been the legacy of western civilization generally, with its bloody persecutions and lesser intolerances incited by official

preference being given one religion over another. As a curious example, enlightening for our present purposes, in 380 A.D. Emperor Theodosis I, professing Catholic Christianity for himself *and* his subjects, not only declared all other Christians "heretics" but he forbade their congregations to assume the name of "churches." *See* Sandoz, Conceived in Liberty: American Individual Rights Today 128 (1978).

Article I, Section 6 of the Constitution of the State of Texas derives from a similar provision in the Constitution of the Republic of Texas: "No preference shall be given by law to any religious denomination or mode of worship over another, but every person shall be permitted to worship God according to his own conscience." Tex.Const. Declaration of Rights, third subdivision (1836). This guarantee of religious freedom issued from a more immediate experience of the Texian colonists, referred to in the Texas Declaration of Independence, wherein they charged in justification of their separation from the Republic of Mexico that it had denied them "the right of worshipping The Almighty according to the dictates of our own conscience by the support of a national religion, calculated to promote the temporal interest of its human functionaries rather than the glory of the true and living God." *See Church v. Bullock,* 104 Tex. 1, 109 S.W. 115, 117–18 (Tex.1908).

17(g)(5)(E) which produces any constitutional invalidity in the statute; no such defect is apparent on the face of the statute itself. We conclude that the word "church," as used in the statute, includes at minimum any religious organization which, as the whole of its activities, advocates and teaches its particular spiritual beliefs before others with a purpose of gaining adherents to those beliefs and instructing them in the doctrine which those beliefs comprise. The evidence is undisputed that the Foundation does as much as the final sum of its corporate activities. We hold, accordingly, that the Foundation is a "church" within the meaning of the statute and that the trial court erred in its conclusion of law that the Foundation was subject to the mandatory contributions required by the Texas Employment Compensation Act. The judgment of the trial court is, therefore, reversed and judgment here rendered that the State take nothing by its suit.